UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 16-1250 JGB (KKx)** | Date | June 6, 2017 |
| Title | *Alice McBurnie v. Life Insurance Company of North America* | | |

Present: The Honorable   **JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE**

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):   Attorney(s) Present for Defendant(s):

None Present   None Present

**Proceedings:**   **FINDINGS OF FACT AND CONCLUSIONS OF LAW (IN CHAMBERS)**

  In this Employment Retirement Income Security Act ("ERISA") action, Alice McBurnie ("Plaintiff") alleges she was wrongfully denied disability benefits. Plaintiff seeks recovery of disability benefits under an ERISA-governed benefit plan established and maintained by her former employer, Macy's Inc. ("Macy's"). Life Insurance Company of North America ("LINA" or "Defendant") is the payor of the benefits Plaintiff seeks.

  Plaintiff and Defendant filed their trial briefs on February 28, 2017. ("Pl. Br.," Dkt. No. 34, and "Def. Br.," Dkt. No. 32.) On March 21, 2017, the Parties each filed responsive trial briefs. ("Pl. Opp'n," Dkt. No. 39, "Def. Opp'n," Dkt. No. 38.) Upon reviewing the Parties' trial briefs and the Administrative Record ("AR"), the Court determined that oral argument was unnecessary for decision on this matter, and therefore took the matter under submission on May 16, 2017. See Local Rule 7-15; Fed. R. Civ. P. 78.

## I. FINDINGS OF FACT

  "In bench trials, Fed. R. Civ. P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 792 (9th Cir. 1986) (quoting Fed. R. Civ. P. 52(a)). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate

conclusions." Id. (citations omitted). The following constitutes the Court's findings of fact based on the Administrative Record.[1]

Plaintiff worked for Macy's as a Sales Manager for approximately six years, from November 2004 until March 2010. (AR 5.) This job required her to "spend 75 to 80% of the week on the selling floor," train and coach associates, "ensure optimum sales floor coverage to support anticipated business," "manage selling floor and fitting room recovery and merchandise fill-in process," "manage physical inventory process," and satisfy other related duties. (AR 570, 909.) This job was classified as requiring "light demand activities" according to CIGNA Group Insurance because its physical demand requirements included "lifting, carrying, pushing, pulling 20 lbs occasionally, frequently up to 10 lbs, or negligible amount[s] constantly," and "walking and/or standing frequently." (AR 910.)

In 2007, Plaintiff underwent a lumbar fusion to address a 20-year old fracture of her lumbar spine. (AR 757.) This procedure and recovery forced her to take leave from work for one year. (Id.) However, she "fully recovered" and had no work restrictions remaining when she returned to work. (Id.)

On March 14, 2010, Plaintiff fell on an escalator while at work when the escalator stopped abruptly. (AR 84, 111, 754, 759, 761.)[2] This fall heralded her last day of work: she officially "ceased working" on April 1, 2010. (AR 130.) At the time of her fall, she noticed pain in her lower back, which increased to severe pain within approximately five days. (AR 754.) She subsequently sought medical treatment, and received Percocet, anti-inflammatories, and a Toradol injection. (Id.) However, when her pain continued to increase, she was referred to Dr. Tahernia, an orthopedic surgeon in Rancho Mirage, who ordered an MRI study of the lumbar spine. (AR 755.) The study showed an injury at L3-4. (Id.) She subsequently underwent surgery "to include laminectomy, foraminotomy, hardware removal, and evaluation of the fusion." (Id.) However, and despite extensive physical therapy, she continued to experience "episodic throbbing," "stabbing pain that radiate[d] to the left foot," spasms, and numbness in her left foot. (Id.)

In January 2012, Dr. Darren Bergey, M.D., Plaintiff's orthopedic spine surgeon and primary treating physician, conducted an evaluation of Plaintiff's condition, noting the abnormal CT scan of her lumbar spine, left L5 foraminal stenosis due to bone overgrowth, "hypersensitivity with paresthesias," motor loss to her left foot, and her complaints of ongoing

---

[1] In reviewing the Parties' Proposed Findings of Fact, the Court notes that Plaintiff has neglected to cite consistently to the record. (See e.g., Nos. 13, 23, 30.) This has made it more difficult for the Court to review the basis for some of her contentions.

[2] There is some inconsistency in the record as to the date of the incident: some indicate that her fall occurred on March 14, 2010 (see, e.g., AR 748), while others state that it occurred on March 18, 2010 (see, e.g., AR 111). Because the March 14 date appears more consistently throughout the record, the Court accepts it as the correct date.

back pain with radiation into the left leg and foot. (AR 781.) He recommended "no pushing, pulling, lifting greater than 25lbs," "limited bending and stooping," and concluded that she met the criteria for "DRE Lumbar Category V in the 25% to 28% impairment of the whole person range." (AR 781.)

During that time, Plaintiff was also seen by orthopedic surgeon Peter J. Sofia, M.D., the Qualified Medical Evaluator appointed by the Workers' Compensation Appeal Board ("WCAB"). (AR 885-894.) He, too, documented her complaints of persistent lower back pain and radiating left leg pain, as well as decreased lower extremity sensation on her left foot, a reduced range of motion of the back, and decreased strength. (AR 888-891.) He diagnosed her with "isthmic spondylolisthesis," "new onset left leg radicular pain," "S1 decompression with residual symptoms and residuals that are not expected to improve," and arachnoiditis, and determined that she had "reached a plateau of maximum medical improvement." (AR 890, 892.) He also found that the primary cause of disability was the March 14, 2010 fall. (AR 891.) Finally, he concluded that she was "not capable of performing the prolonged, sustained stationary standing and walking required by her and customary occupation of sales clerk or sales manager and is unable to safely return to that type of work." (AR 892.) Instead, she required a work restriction "falling midway between limitations to light and semi-sedentary work," explaining that she should be permitted to be off her feet for 20 minutes for every 40 minutes of sustained or continual weight-bearing. (AR 891.)

In October 2012, Plaintiff submitted a long-term disability ("LTD") claim with LINA. (AR 904, 912.) She withdrew this claim in November 2012, explaining she did not want the "hassle" (AR 100), but re-opened her claim in May 2014 (AR 92). LINA then approved her for benefits in June 2014 and paid out those benefits retroactively for a period of disability beginning in September 2012. (AR 178.) In August 2014, however, LINA notified Plaintiff that "the definition of Disability will change," and that it would have to conduct a review of her file to determine if she would continue remain eligible for benefits under the new standard. (AR 178.) Specifically, while the previous standard required LINA to consider whether Plaintiff was capable of returning to her own occupation, the new standard—which became effective after Plaintiff had received over 24 months of disability payments—required LINA to consider whether Plaintiff could perform the essential duties "of *any* occupation for which she [] is, or may reasonably become, qualified." (AR 178 (emphasis added).) One month later, on September 3, 2014, LINA informed Plaintiff that, after completing their review of her claim under this new standard, it determined that she was no longer entitled to continued benefits. (AR 175.) That letter explained that the 2012 assessments conducted by Dr. Bergey indicated that, although she had restrictions on pushing, pulling, and lifting more than 25 pounds, she was "capable of functioning at a sedentary level of demand." (AR 176.) Based on his assessment, as well as her education and employment history, LINA concluded that she would be able to perform the following occupations: assignment clerk, order taker supervisor, or personnel scheduler. (Id.)

Plaintiff appealed LINA's claim decision on February 3, 2015. (AR 514.) Her appeal letter included copies of more recent medical records, including a June 2014 evaluation by Dr.

JienSup Kim, M.D., an August 2014 evaluation by Dr. Bergey, a December 2014 evaluation by Dr. Bergey, a January 2015 evaluation by Dr. Bergey, and a January 2015 MRI report from Christopher R. Hancock, M.D. (AR 518-537.) However, on May 15, 2015, LINA upheld its prior decision to deny her claim. (AR 150.) The letter indicated that the medical reviewer "attempted to contract [Plaintiff]s] treating providers Dr. Roger and Dr. Bergey," but were unsuccessful. (AR 151.) Based on the medical records Plaintiff provided, LINA determined that Plaintiff could stand up or walk for two out of eight hours and sit for six out of eight hours. (Id.) The letter also indicated that "[s]tand walking [sic] is not recommended for more than 15 minutes consecutively with 30 minutes of rest." (Id.) Accordingly, LINA reaffirmed the Plaintiff could perform the three occupations identified in its earlier letter. (Id.)

In response, Plaintiff submitted a second appeal providing updated medical documents and criticizing LINA's analysis in reaching its claim decision. (AR 395.) Specifically, Plaintiff emphasized the medical reports of Dr. Bergey, Dr. JienSup Kim, Dr. Douglas Roger, Dr. Stanton Kremsky, and Dr. Er-Kai Gao as proving that she could not return to work. (AR 395-98.) In response, LINA obtained a peer review of the reports of Plaintiff's physicians from Meghana C. Karande, M.D. (AR 483.) Dr. Karande did not personally evaluate Plaintiff or speak with any of Plaintiff's physicians. (AR 484.) Dr. Karande reviewed the reports of Dr. Bergey, Dr. Kim, and Dr. Roger, and concluded that Plaintiff suffered from chronic lumbar pain, but that she could stand or walk for two out of eight hours, and would be able to sit for six out eight hours. (AR 486.) Based on Dr. Karande's conclusion, LINA informed Plaintiff on May 13, 2015 that it stood by its previous finding that Plaintiff could perform the sedentary occupations of assignment clerk, order taker supervisor, or personnel scheduler. (AR 482.)

Because the Parties' conflict centers on whether Plaintiff is, in fact, able to perform the duties of these sedentary occupations, the Court outlines here the findings and conclusions of the above-referenced reports, as well as more recent medical records documenting Plaintiff's condition. As a note, the Court focuses here on the medical records from 2014 and on, since the question is whether LINA wrongfully denied Plaintiff's claim in September 2014 (and wrongfully reaffirmed its denial following Plaintiff's appeals); Plaintiff's condition in 2012 and 2013, while not irrelevant, thus has less probative value here than her condition—as documented in medical records—through 2014 and 2015.

**August 27, 2104, December 19, 2014, & January 29, 2015 reports from Dr. Bergey (spinal surgeon)** – AR 522-35

Dr. Bergey examined and treated Plaintiff numerous times beginning in 2011. His reports consistently document that she experienced lower back and radicular pain, and note that, beginning in 2014, she began to experience pain radiating down her right leg (although the pain had originally affected only her left leg). He further recorded her complaint that "her left leg gave out causing her to fall several times," her "inability to stay in one position for extended periods," and noted that "she has ongoing spasms" requiring medication. He found that she presented "palpable tenderness of the paravertebral muscles, bilaterally," and that her MRI scans documented "a small annular tear at L4-5," "grade I spondylolisthesis at L5-S1," and "at

least moderate foraminal narrowing." However, he did not make any recommendations with regard to work restrictions.

**June 13, 2014 report from Dr. Kim (physical medicine and rehabilitation specialist)** – AR 586-89

Dr. Kim met with Plaintiff for an initial pain management evaluation. He noted that she experienced pain in her low back that radiated down both legs. He found that the "range of motion of the lumbar spine is significantly limited secondary to pain," as well as "tenderness to palpation over the paraspinal muscles in the lumbar region bilaterally." He determined that she had a "degenerative disc disease at L5-S1" and "an annular tear at the same level." He did not make any recommendations with regard to work restrictions.

**March 9, 2015 & April 15, 2015 reports from Dr. Roger (orthopedic surgeon)** – AR 407-08

Dr. Roger's one-page report for March 9 states: "The patient is Temporarily Totally Disabled until the next appointment on 04-15-15." His one-page report for April 15 does not indicate her disability status, but notes only that her condition is "Permanent & Stationary with no return visits scheduled." (Strangely, he also checked the box indicating that she had a return appointment on May 27, 2015.)[3]

**August 11, 2015 report from Dr. Johnson (orthopedic surgeon)** – AR 372-381

Dr. Johnson conducted an "initial orthopedic evaluation," and found "tenderness to palpation at the bilateral PSISs," "bilateral lumbar paraspinal muscle guarding," and decreased sensation "at the L4, L5, and S1." He noted that she complained of "constant moderate to severe" pain associated with "numbness and tingling of the bilateral lower extremities," and recorded her complaint that the pain "is aggravated by prolonged positioning including sitting, standing, walking, bending, arising from a sitting position, ascending or descending stairs, and stooping." He diagnosed her, among other things, with "lumbar spine sprain/strain," radiculitis in the lower extremity, and residual pain from two lumbar spine surgeries. He also concluded that she was "temporarily totally disabled as from 8/11/2015 to 9/22/2015." However, he also

---

[3] Plaintiff states that Dr. Roger diagnosed her with "bilateral lower extremity radiculopathy," and contends that Dr. Roger noted various complaints of pain by Plaintiff. (Dkt. No. 42-1 at 7.) However, Plaintiff only cites to AR 278-80 and AR 408 for these propositions. AR 408 contains only a checklist on which Dr. Roger indicates that Plaintiff has a return appointment and that her condition is permanent and stationary, while AR 278-80 contain summaries of Dr. Roger's report compiled as part of a December 2015 report by Dr. Harvey L. Alpern. But Plaintiff did not seem to provide Dr. Roger's report itself (apart from the checklist noted here) and the Court is unwilling to treat Dr. Alpern's summary of Dr. Roger's report as undisputed, given that it is unclear from the former's report whether he is paraphrasing or quoting directly from the latter.

qualified his conclusion by noting that, "should either a detailed JA or RU91 be sent for my review, I will be more than happy to address alternative/modified duty and work status in greater detail . . . It would also be helpful to know specifically what the employer is willing to provide in the way of modified duty." As well, his conclusion that she could not return to work seems to have been informed, at least in part, by his understanding that her job duties "consisted of performing repetitive walking, standing, bending, squatting, climbing ladders, kneeling, twisting in a frequency of 8 hours per day."

**August 31, 2015 report from Dr. Kremsky (radiologist) – AR 409-412**

Dr. Kremsky performed and reviewed an MRI of Plaintiff's lumbar spine. He found "mild disc desiccation at L1-L2 down to L5 S1," "plate degenerative changes" on the vertebral endplates, and "diffuse disc hernation" at L4-L5. He did not make recommendations or determinations as to Plaintiff's possible work restrictions.

**September 22, 2015 & October 2, 2015 reports from Dr. Gao (neurologist) – AR 413-418**

Dr. Gao conducted a physical exam and reviewed Plaintiff's diagnostic tests. He noted that the MRI revealed "left L5/S1 nerve root compression by granueloma tissue," as well as "right lumbrosacral preganglionic lesion." He diagnosed her with 1) left lumbar radiculopathy; 2) neuropathic pain; 3) "failed back syndrome"; and 4) possible arachnoiditis.[4]

**December 29, 2015 report by Dr. Harvey L. Alpern (specialist in cardiovascular disease and internal medicine) – AR 322-349[5]**

Dr. Alpern conducted a physical exam and an extensive review of her medical history, including a review of her diagnostic studies and her medical records dating back to August 2011. He noted that Plaintiff complained of chronic pain, leg cramps, that she had difficulty getting on and off the examination table, and that "she can walk one or two blocks and perhaps one flight of stairs very slowly while holding on," but that she is limited by low- and mid-back pain, and pain that radiates down both legs. He found that she had hypertension, failed back syndrome, a history of arachnoiditis, and obesity, and concluded that "she is clearly totally disabled from work at this time," and that "she cannot complete an eight-hour workday." However, he somewhat qualified his conclusion, noting that "impairment will be addressed once I have

---

[4] However, his notation seems to indicate that the arachnoiditis diagnosis was not supported by her last MRI. (See AR 415 ("Her last L-spine MRI only revealed grandulation with L5/S1 nerve root compression? And does not carry the diagnosis of arachnoiditis."))

[5] Dr. Alpern is not Plaintiff's treating physician, but an independent physician hired to conduct a Qualified Medical Examination ("QME") as part of Plaintiff's Workers' Compensation claim. (AR 251.)

received the results of diagnostic testing." It does not appear that this supplemental report is part of the Administrative Record.[6]

**December 28, 2015 report by Dr. Sofia (orthopedic surgeon)** – AR 289-97[7]

Dr. Sofia examined Plaintiff various times between April 2011 and December 2015 and conducted a thorough review of her medical records. He noted her complaints of constant low back pain that radiated down both lower extremities, which "increase with any and all physical activity including standing, walking, prolonged sitting, driving, and any attempt at bending or lifting." The pain is "partially reduced by rest and medication." He also noted that Plaintiff had "no trouble with hair care, writing, typing, gripping or grasping," but had moderate trouble with other daily activities, including dressing, cooking, standing, walking, and driving. He diagnosed her with left leg radicular pain, "status post left S1 decompression with residual symptoms," and arachnoiditis.

Dr. Sofia addressed her work restrictions, noting that he found that her work restrictions were "unchanged" from his previous report (his previous report indicated that she required a work restriction "falling midway between limitations to light and semi-sedentary work," and recommended that she be permitted to be off her feet for 20 minutes for every 40 minutes of sustained or continual weight-bearing (AR 891)). He further opined as follows:

> "The applicant cannot do her previous job. She claims she cannot work at all. I do not know that this is true. People who have no legs can work and people in wheelchairs can work so I do not necessarily agree with her assessment of her situation. She is a Qualified Injured Worker because she is, her vociferous complaints notwithstanding, capable of returning to some sort of gainful employment. In my opinion however, she does have the residual functional capacity to participate in vocational rehabilitation and could be retrained to an appropriate vocational goal. She requires permanent restrictions but in my view, she is not permanently totally disabled, by any means." (AR 296.)

The final report in the Administrative Record is that of Dr. Joseph Rea, LINA's peer review physician, who did not meet with Plaintiff, but, like Dr. Karande, conducted a review of Plaintiff's medical records. (AR 243-49.) For his report, he summarized the reports by Dr.

---

[6] Plaintiff's proposed findings of fact do not identify or reference any additional examinations or reports by Dr. Alpern. (See generally Dkt. No. 12.) Moreover, her Reply brief states that "the last physician to examine McBurnie and offer an opinion regarding her disability was Dr. Alpern" in December 2015. (Pl. Opp'n at 6.) (Plaintiff states that this report was prepared on December 29, 2016, but this appears to be an error; the statement cites to his 2015 report.) Thus, it is unclear whether Dr. Alpern ever supplemented his 2015 report.

[7] See n.5. Dr. Sofia, like Dr. Alpern, was hired to conduct a QME pursuant to Plaintiff's Worker's Compensation claim. (AR 251.)

Bergey, Dr. Kim, Dr. Johnson, Dr. Gao, Dr. Alpern, and Dr. Sofia. (Id.) His report reiterated their findings—namely, that Plaintiff suffered from chronic back pain consistent with her "bilateral radiculopathy," "possible arachnoiditis," and "compressive effects at the lumbar spine." He concluded that she would have "medically necessary work activity restrictions," but that she could "lift, push, pull, or carry up to 10 pounds on an occasional basis," stand for up to 15-minute periods at a time, walk for up to 15-minute intervals, climb stairs with support, and that "[t]here is no indication for any limitation with sitting or general hand usage." (AR 248.)

LINA's Vocational Rehabilitation Consultant subsequently reviewed the occupations previously identified—assignment clerk, order taker supervisor, and personnel scheduler—and determined that they could be performed with the restrictions and limitations provided by Dr. Rea. (AR 240-41.) LINA also surveyed employers within 60 miles of Plaintiff's residence and determined that there were at least six employers who offered full-time positions for the identified occupations. (AR 229-35.) Accordingly, LINA again upheld its original determination, informing Plaintiff of its decision by letter dated March 31, 2016. (AR 121-32.)

## II. CONCLUSIONS OF LAW

### A. Standard of Review

Under ERISA, a beneficiary or plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006). A denial of benefits under 29 U.S.C. § 1132(a)(1)(B) is reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 956-957 (1989). A court employing de novo review in an ERISA case "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006). "[T]he court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Const. Mgmt. Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010). In reviewing the Administrative Record, "the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010). Plaintiff bears the burden of showing, by a preponderance of the evidence, that she was disabled under the terms of the plan during the claim period. Eisner v. The Prudential Ins. Co. of Am., 10 F. Supp. 3d 1104, 1114 (N.D. Cal. 2014).

### B. Discussion

As the Court is applying de novo review, no deference is given to the claim administrator's decision, and the Court merely evaluates the persuasiveness of each side's case and determines if Plaintiff has adequately established that she is disabled under the Plan.

Plaintiff contends that she is "disabled" under the terms of the LTD plan because she is unable to perform the material duties of any occupation for which she is qualified.[8] The plan's operative definition of "disability" is as follows:

> "After Disability Benefits have been payable for 24 months, the Associate is considered Disabled if, solely due to Injury or Sickness, he or she is unable to perform the essential duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience." (AR 940.)

Here, neither Party disputes that Plaintiff was unable to perform the duties of her previous position as Sales Manager at Macy's, which required her to be on her feet for a large portion of the day. Instead, the Parties' dispute centers on whether Plaintiff's condition renders her unable to perform the duties of more sedentary positions. Specifically, LINA has identified three possible sedentary occupations that are within Plaintiff's geographical region and that satisfy her earnings requirement under the plan.[9] (AR 172.) However, Plaintiff argues that LINA's assessment of her condition downplays her treating physicians' findings regarding her functional limitations. The Court evaluates this contention against the factual record.

### 1. Plaintiff's medical condition and work restrictions

The Court notes first that the medical records are largely consistent as to their "objective" assessments of Plaintiff's condition. That is, the records of the various physicians, as summarized above, confirm the MRI findings of chronic spondylolisthesis, an annular tear at L4-5, and at least moderate foraminal narrowing, as well tenderness to palpations, lower

---

[8] Plaintiff's opening trial brief argues in part that LINA's claim decision was not "credible" because it had previously approved her claim for benefits. (See Pl. Brief at 17 ("LINA's claim decision is not credible . . . because, despite previously approving McBurnie's LTD claim, LINA denied her ongoing claim without substantial evidence of a change in or improvement of her condition, or an adequate explanation of why she no longer qualified for disability.").) The Court rejects this argument. LINA's earlier approval of benefits was made under the "own occupation" standard, under which an associate is considered disabled "if, solely because of Injury or Sickness, he or she is unable to perform the essential duties of his or her Regular Occupation." (AR 171, 940.) However, "[a]fter Disability Benefits have been payable for 24 months, the Associate is considered Disabled if, solely due to Injury or Sickness, he or she is unable to perform the essential duties of *any* occupation for which he or she is, or may reasonably become, qualified." (AR 940 (emphasis added).) Accordingly, there is no mystery as to why LINA reached a different conclusion in 2014 than it had in 2012: the standard for assessing Plaintiff's status as "disabled" was markedly different, pursuant to the express terms of the plan.

[9] Plaintiff has some quibbles with the specific jobs identified by LINA, which the Court will discuss later in this Order.

extremity radiculopathy, a potential diagnosis of arachnoiditis, and a limited range of motion of the lumbar spine. This general agreement as to her "objective" condition among her physicians and examiners, however, does not answer the question of whether Plaintiff is unable to perform any qualifying occupation under the plan—and the Court, of course, cannot make its own medical determination as to her capabilities. Thus, the Court examines those statements in the medical records that speak more directly as to Plaintiff's capabilities.

In this analysis, the Court notes as a general matter that it places greater weight on the opinions of those physicians who: 1) directly examined Plaintiff; 2) during multiple visits; 3) over extended periods of time. See Shaw v. Life Ins. Co. of N. Am., 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015), appeal dismissed (July 21, 2016) (credibility of physicians' opinions turns "not only on whether they report subjective complaints or objective medical evidence of disability," but also on "the extent of the patient's treatment history"); see also Montour v. Hartford, 588 F.3d 623, 634 (9th Cir. 2009) (insurer's decision to conduct a "pure paper review" can raise "questions about the thoroughness and accuracy of the benefits determination."). Thus, the Court prioritizes the findings and recommendations of Dr. Bergey and Dr. Sofia—who examined Plaintiff directly multiple times over the course of four years—over those of Dr. Karande and Dr. Rea, who never directly examined Plaintiff or even spoke with her physicians, but only conducted a one-time review of her records. As such, the Court is unwilling to defer to the conclusions of these secondary sources—Dr. Karande and Dr. Rea's secondhand summaries of the reports— over the primary ones—the reports of physicians who repeatedly and/or directly examined Plaintiff. This is particularly true given signs of carelessness in the latter's report: Dr. Karande, for example, states in the first sentence of her report that Plaintiff's claim of disability is "due to allegations of face and neck injury" (AR 483): this surprising statement contradicts every other document on the record.

However, despite discounting the conclusions of Dr. Karande and Dr. Rea, the Court finds that Plaintiff has not met her burden in establishing that she is unable to perform any qualifying occupation. This is because the only medical records that specifically address her functional limitations indicate that she is capable of returning to work with restrictions. Dr. Bergey's 2011 report, for example, recommended only that Plaintiff refrain from "pushing, pulling, [or] lifting greater than 25lbs," and "limited bending and stooping." (AR 751.) Dr. Sofia's assessment in 2012 is consistent with Dr. Bergey's: he determined that Plaintiff "requires a work restriction falling midway between limitations to light and semi-sedentary work," noting that "she should be permitted to be off her feet for 20 minutes for every 40 minutes of sustained or continual weight-bearing." (AR 891.) Dr. Bergey's more recent reports—from 2014 and 2015—are silent as to Plaintiff's restrictions, apart from noting only that she is "permanent and stationary."[10] (AR 528.) But, as shown in the excerpt from his report quoted above, Dr. Sofia indicated that Plaintiff could return to "some sort of gainful employment" (AR 296); he further

---

[10] This is a medical term of art indicating that the patient's systems have "plateaued" and that "she can be considered as having reached maximal medical improvement (MMI)." Campos v. Astrue, No. CV09-06213SS, 2010 WL 3749300, at *3 (C.D. Cal. Sept. 21, 2010).

indicated that her work restrictions were "unchanged from previous reporting," in which he stated that her condition limited her to "light and semi-sedentary work" in which she could be off her feet for 20 minutes after sustained weight-bearing (AR 891)[11].

The opinions from Dr. Alpern, Dr. Johnson, and Dr. Roger—which refer to Plaintiff as "totally disabled"—do not sufficiently rebut Dr. Bergey's and Dr. Sofia's conclusions because none of them explain how or to what extent Plaintiff's condition prevents her from fulfilling the requirements of light and semi-sedentary work. First, Dr. Roger's "statement" that she is "temporarily totally disabled until 4-15-15" does not contain any analysis, but is only a checkmark on a pre-filled form. (AR 407.) Neither does this "report" contain any explanation for the type of disability, the reason for her limitations, or why she might no longer be disabled after April 15, 2015. (Id.) Next, Dr. Johnson's note that she is "considered temporarily totally disabled as from 08/11/2015 to 09/22/2015" seems based on his understanding of the duties required for her former job: he notes that "the physical demands of her job duties consisted of performing repetitive walking, standing, bending, squatting, climbing ladders, kneeling, twisting in a frequency of 8 hours per day." (AR 374, 379). That he believed she *could* return to work if her duties were modified seems clear from his subsequent qualification that "I will be more than happy to address alternative/modified duty and work status in greater detail at the patient's follow-up examination," explaining that "[i]t would also be helpful to know specifically what the employer is willing to provide in the way of modified duty." (AR 379.) Dr. Roger's report, therefore, supports rather than undermines the conclusion that Plaintiff is capable of returning to work *subject to limitations*. (Unfortunately, Plaintiff does not provide Dr. Roger's supplemental report, which, if it exists, might shed more light on what limitations he believed she might require.)

Finally, Dr. Alpern's report similarly neglects to explain how or why Plaintiff's limitations render her unable to work: the latter states that "[Plaintiff] cannot complete an eight-hour workday," but does not explain why this should be so. (AR 347.) For example, does her pain render her unable to sit at a desk? Does she require constant rest to ease the pain? His report indicates that "[s]he can drive and go to the store," and that she needs help with cooking, household activities, and carrying packages, but does not address whether she is able to remain in sitting or standing positions. (AR 324.) Without a clearer and more definitive explanation of how her conditions render her unable to perform the duties of any job, the Court cannot rely on Dr. Alpern's report to supersede the express recommendations of Dr. Bergey and Dr. Sofia, who similarly acknowledged Plaintiff's chronic pain and weaknesses, but found that she could perform a job subject to certain limitations. In this respect, none of the remaining reports are sufficient either: Dr. Gao, Dr. Kremsky, and Dr. Kim do not make any recommendations or findings as to possible work limitations or restrictions, and their agreement as to her diagnosis does not mean

---

[11] Plaintiff argues that LINA unjustifiably relied on outdated records in using Dr. Sofia and Dr. Bergey's recommendations. (Pl. Brief at 7 n.2, 21.) But Dr. Bergey did not provide any updated recommendation when he examined her multiple times in 2014 and 2015, while Dr. Sofia *incorporates* his recommendation from 2012 in his 2015 report.

that she is unable to work.  In the words of Defendant, "the existence of a medical condition does not prove functional limitation."  (Def. Opp'n at 10.)

None of this is to discount Plaintiff's clear and documented experience of pain.  The review of her medical records makes clear that she has suffered and continues to suffer from severe pain from her lower back and radiating down her right and left legs and feet.  (AR 289-91, 522-34, 748-51, 777-88, 793-97, 821-25, 891.)  But her experience of pain does not suffice to establish that Plaintiff is unable to return to work: the Court cannot come up with its own medical conclusions as to Plaintiff's limitations to supersede specific and express findings by physicians who examined her.  Accordingly, the Court finds that LINA was justified in denying Plaintiff long-term disability benefits during the "any occupation" period under the plan.

### 2. LINA's occupational analysis

In addition to challenging the justification for LINA's finding that she could not fulfill the duties of any occupation for which she could become qualified, Plaintiff also challenges the specific jobs that LINA offered as options.  (Pl. Brief at 22.)  Specifically, she argues that "LINA failed to ascertain that these jobs were available," and that "the only positions identified "required [her] to undergo an unreasonable amount of training."  (Id.)

LINA's "Transferrable Skills Analysis" ("TSA") identified occupations that were consistent with her skills and abilities, education and training, and satisfied "the earnings requirement for [her] Indexed Covered Earnings" under the plan.[12]  Based on Plaintiff's skills, education, training, and wage requirements, the TSA identified the positions of "assignment clerk," "order taker supervisor," and "personnel scheduler" as possible options.  (AR 241, 568.)  These positions "are sedentary and require mostly sitting, occasional stand/walk, lifting of negligible weight to 10 pounds and frequent reaching at desk level."  (AR 241.)  These duties, in the Court's view, are consistent with the restrictions that Dr. Sofia recommended in 2012 and reaffirmed in 2015.  To find these jobs, LINA performed a Labor Market Survey "within a sixty-mile radius of Joshua Tree, California," where Plaintiff lives.  (AR 229.)  This survey found six (or seven, depending on how the salary is calculated) positions in her area that met the salary requirement.  (AR 230-36.)

However, Plaintiff argues that "[t]he allegation that McBurnie could perform these jobs is useless without any attempt to confirm that they are actually available to her."  (Pl. Brief at 22.)  Defendant responds that "the LTD policy in question is not unemployment insurance and

---

[12] The Court is not clear as to how LINA calculates the earnings requirement: the plan documents included as part of the record specify only that the associate is considered disabled if she is "unable to perform the essential duties of any occupation for which [she] is, or may reasonably become, qualified based on education, training or experience."  (AR 940.)  The Parties do not seem to have included the part of the plan—if any—that specified salary requirements for the possible occupations.  However, the TSA found that Plaintiff's "wage requirement" was $3,092.54 a month and Plaintiff did not challenge this finding.  (AR 568.)

LINA is not a job placement service . . . LINA need only establish that suitable jobs exist." (Def. Opp'n at 14.)

In resolving this disagreement over the extent of LINA's responsibilities, the Court is guided by the instruction from the Ninth Circuit that an ERISA plan should be interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience," looking to the explicit language of the agreement to determine, if possible, the clear intent of the parties. Richardson v. Pension Plan of Bethlehem Steel Corp., 112 F.3d 982, 985 (9th Cir. 1997) (internal citations and quotation marks omitted). Under this framework, the Ninth Circuit concluded that the "any occupation" standard was "not demanding" where the plan contained language very similar to that at issue here. McKenzie v. Gen. Tel. Co. of California, 41 F.3d 1310, 1317–18 (9th Cir. 1994) overruled on other grounds by Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863 (9th Cir. 2008). Specifically, the court considered the following language: "[A]fter the first 18 months you will be considered totally disabled only if you are completely unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are or become reasonably qualified by training, education or experience." Id. at 1313. To show that an employee was not totally disabled under this definition, then, the court found that it was sufficient to show that an employee *had the capacity* to perform *some* job for which he was qualified or could reasonably become qualified. Id. at 1317. In other words, the court said, the administrator must show only that the employee "was not unemployable." Id. at 1317.

The Ninth Circuit's decision in Pannebecker v. Liberty Life Assur. Co. of Boston, 542 F.3d 1213, 1220 (9th Cir. 2008) fifteen years later reaffirmed McKenzie's conclusion that the "any occupation" standard was not demanding and further rejected the plaintiff's attempt to read more requirements in to the plan than those expressly stated by the "any occupation" provision. 542 F.3d at 1220. There, the language of the plan stated that an employee was disabled where she was "unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity." Id. at 1218. Emphasizing that the language should be interpreted "to mean what it said," the court held that the plan did not require the employer to specifically identify a job with a "reasonably substantial income" or that comported with the claimant's most recent salary or station in life, as the plaintiff had argued. Id.

Here, the language of the plan provides that an employee is disabled if, "solely due to Injury or Sickness, he or she is unable to perform the essential duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience." Following the approach of McKenzie and Pannebecker, the Court finds that this language does not require LINA to verify that each of the possible jobs for which Plaintiff may be qualified is *available*; the language indicates only that the job must *exist*. The express language of the provision does not indicate that LINA has any duty beyond showing that there is an occupation that exists for which Plaintiff is or may become qualified and that she is able to perform, and Plaintiff has pointed to no evidence, extrinsic or otherwise, that would impose a more demanding standard. See Gemmel v. Systemhouse, Inc., No. CIV 04-198-TUC-CKJ, 2009 WL 3157263, at *13 (D. Ariz. Sept. 28, 2009) ("The Court finds the Plan does not have the responsibility to show

actual availability of employment."); see also Lamarco v. CIGNA Corp., No. C 99-0561 MJJ, 2000 WL 1456949, at *8 (N.D. Cal. Sept. 25, 2000) ("When coverage provisions in general disability policies require total inability to perform 'any occupation,' the courts have assigned a common sense interpretation to the term 'total disability' so that total disability for purposes of coverage results whenever the employee is prevented from working with reasonable continuity in his customary occupation or in any other occupation in which he might reasonably be expected to engage given his station and physical and mental capacity.")

As for Plaintiff's second argument—that she is not qualified for the occupations identified because they require "between three and twelve months of training" (Pl. Brief at 22)—the Court finds that Plaintiff has again ignored the plan language of the plan. Specifically, the provision does not require that LINA identify only jobs for which Plaintiff is already qualified, but also those for which she may "reasonably become" qualified. Given this language, the Court rejects Plaintiff's contention that the need for additional training violates the requirements of the plan. See also Haber v. Reliance Standard Life Ins. Co., No. CV149566MWFMANX, 2016 WL 4154917, at *7 (C.D. Cal. Aug. 4, 2016) ("Haber's suggestion that qualifying alternative occupations should not require any on-the-job training or orientation is unrealistic and impractical. The Court also concludes that this argument is unsupported by the plain language of the "Any Occupation" definition."). It is normal that any new job would involve some necessary training, and the Court finds that a training period of three to twelve months falls within a reasonable range.

Finally, Plaintiff argues that LINA failed to engage in a "meaningful dialogue" with her about her claim. (Pl. Brief at 25.) Contrary to Defendant's contention, this argument is not irrelevant in the context of de novo review. See, e.g., Tinker v. Versata, Inc. Grp. Disability Income Ins. Plan, 566 F. Supp. 2d 1158, 1164 (E.D. Cal. 2008) (applying de novo review and finding that plan administrator failed to engage in meaningful dialogue); Bunger v. Unum Life Ins. Co. of Am., 196 F. Supp. 3d 1175, 1186 (W.D. Wash. 2016) ("When a district court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant . . . However, this does not relieve the plan administrator from its duty to engage in a 'meaningful dialogue' with the claimant about his claim.") (internal citations omitted). However, in this case, the Court finds that LINA complied with this requirement. The requirement—which is derived from 29 C.F.R. § 2560.503—calls for the administrator to explain its denial in "reasonably clear language, with specific reference to the plan provisions that form the basis for the denial," and, "if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it." Booton v. Lockheed Med. Ben. Plan, 110 F.3d 1461, 1463 (9th Cir. 1997). LINA did so. In its notice and denial letters, it provided the standard under which it was reviewing Plaintiff's condition, highlighted the specific reports that formed the basis for its opinions as to her condition, and explained the process by which it determined which job duties she was capable of performing. (AR 178-79, 171-73, 478-81.) It further provided her the opportunity to provide additional medical records, which it reviewed, in the course of her two appeals of the decision. (AR 395-427, 514-553.) Accordingly, the Court rejects Plaintiff's argument that LINA flouted its ERISA obligations.

## III. CONCLUSION

Based on its findings of fact and conclusions of law, the Court concludes that Plaintiff has not adequately established that she was disabled under the terms of the plan during the any occupation period.[13]  Accordingly, the Court affirms LINA's decision in terminating Plaintiff's LTD benefits.

**IT IS SO ORDERED.**

---

[13] The Court makes no finding as to whether Plaintiff was disabled during the own occupation period of the plan.